STATE of Missouri, Respondent,

v.

Calvert Leon ANTWINE, Appellant.

No. 67720.

Supreme Court of Missouri,
En Banc.

Dec. 15, 1987.

Rehearing Denied Jan. 20, 1988.

David S. Durbin, Asst. Public Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., Elizabeth Levin Ziegler, Asst. Atty. Gen., Jefferson City, for respondent.

ROBERTSON, Judge.

Appellant, Calvert Leon Antwine, was charged by indictment on February 1, 1985, with two counts of capital murder, two counts of armed criminal action[1] and one count of first-degree robbery. The case proceeded to trial before a jury in the Circuit Court of Jackson County on August 22, 1985. Appellant was convicted of first-degree robbery,[2] second-degree murder[3] and capital murder,[4] for which he was sentenced to thirty years imprisonment, life imprisonment, and death, respectively. Appellant appeals from his convictions and sentences.

Because the trial court imposed a sentence of death, this Court is vested with exclusive appellate jurisdiction. Mo. Const. art. V., sec. 3.

While this case was pending on direct appeal to this Court, the United States Supreme Court decided *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), overruling *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the law governing the jury composition issue at the time of trial. In our original opinion of January 13, 1987, we denied appellant's *Batson* argument on the basis of *State v. Lockett* (Mo. banc 1986) (No. 68186, decided December 16, 1986), in which we held that *Batson* should not be given retroactive application. On January 13, 1987, the United States Supreme Court effectively overturned *Lockett*, deciding that *Batson* had retroactive effect to "all cases, state or federal, pending on direct review or not yet final." *Griffith v. Kentucky*, —— U.S. ——, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). In light of *Griffith*, we remanded, *sua sponte*, this case to the trial court "for the purpose of

---

1. The two counts of armed criminal action were subsequently dismissed by the State.

2. Section 569.020, RSMo 1978.

3. Section 565.004, RSMo 1978.

4. Section 565.001, RSMo 1978.

determining the validity of appellant's constitutional claim under *Batson*." On remand, the trial court conducted a hearing on the *Batson* issue, finding that appellant failed to establish a prima facie case of discrimination in the State's use of its peremptory challenges. On rehearing, we again affirm both the judgments of guilt and the sentence of death.

## I.

At approximately 6:00 p.m. on November 11, 1983, appellant arrived at 2108 Vine Street where several men were refurbishing a restaurant for the owner, Eric George Jones ("George"). Appellant, who was known by the workers, asked where George Jones or his brother, Winston, could be found. When the workers, who were involved in a crap game, appeared to ignore appellant, appellant decided to "bust up" the crap game. He produced a handgun and announced, "This is a stick up." After firing several shots into the wall and hitting a space heater, appellant took money from the workers and left the restaurant.

From the restaurant, appellant immediately proceeded to the Lincoln Garden Apartments, located a block away from the restaurant. There he encountered Joy Jones, the sister of George and Winston Jones, who was leaving the apartment she shared with Winston. Joy was several yards from the doorway to her apartment when she saw appellant approaching. When she asked him what he wanted, appellant indicated that he was looking for George and Winston. When Joy asked what he wanted with her brothers, appellant said he was going to kill them. Appellant proceeded to the doorway where he demanded that Winston open the door. Winston cracked open the door, whereupon appellant forced his way in. As the apartment door closed, Joy ran to the restaurant to look for George.

Shirley Ford and her daughter, LaTanya, lived in an adjacent apartment. They observed appellant forcing his way into Joy's apartment, saw that he was carrying a gun, and heard appellant yell, "I'm going to kill all of you mother _____." After appellant entered the apartment, Shirley and LaTanya heard shots. Shirley called the police. She observed appellant leaving the apartment carrying a gun and a black bag. Appellant entered a gold and black car and drove away.

Police officers later found Winston Jones lying face down on the living room floor of the apartment with three gunshot wounds in his head. At trial, the medical examiner testified that two of the wounds were caused by a weapon fired while flush against the skin. Other items found in the apartment included a large quantity of marijuana and twelve hundred dollars in cash.

After leaving Joy's apartment, appellant proceeded to a house at 26th and College from which the Jones brothers operated a drug business. While appellant was there, George Jones arrived with Joy and two others. George knocked on the door where he was met by appellant with a gun in his hand. George turned and fled. Appellant gave chase and caught him. Joy heard appellant say, "I just killed your brother and I'm going to kill you too." Appellant directed George at gun point back to the car and forced George to drive.

Sometime between 6:00 and 7:00 p.m., two police officers were separately dispatched to the intersection of 34th and Prospect on a disturbance call. Upon arrival, the officers observed appellant and George struggling in the middle of the street over the possession of a handgun. The officers approached, secured the gun and broke the two men apart. Both appellant and George were placed under arrest, handcuffed behind the back and put into a paddy wagon for transport to the police station. While in the paddy wagon, appellant stepped through his arms so that his hands were in front of his body.

Upon arrival at the station, Officer Schilling, the paddy wagon driver, placed George and appellant in a holding cell. Approximately five to ten minutes later, Officer Schilling heard a scream coming from the holding cell and ran back to investigate. He and another officer, Detective Lonkan-

sky, entered the cell and found George lying face down on the floor, semiconscious and bleeding from the nose and mouth. Appellant was seated on a bench three to four feet away.

Officer Schilling left the cell to call an ambulance. Realizing that he was wearing his service revolver, Detective Lonkansky called for assistance and stepped out of the cell. He had walked approximately four feet when he heard a loud thumping sound. Turning, he saw appellant in midair, coming down with both feet on the side of George's head. Detective Lonkansky again shouted for assistance. Appellant sat back down on the cell bench, picked up a rag off the floor and calmly proceeded to wipe the blood off of his shoes. The medical examiner testified that George Jones died as the result of a blunt force injury to the head, and that such injury was consistent with being kicked, stomped or beaten against a concrete floor.

Appellant contended that he killed the Jones brothers in self-defense. More specifically, appellant urged the jury to believe that he wanted out of the drug business, in which he was engaged with the Joneses, and that the Joneses threatened to kill him if he carried out his intention to quit.

The jury[5] found appellant guilty of capital murder for the killing of George Jones, guilty of second-degree murder for the killing of Winston Jones, and guilty of second-degree robbery. In the punishment phase of trial, the jury imposed a sentence of life imprisonment for second-degree murder, thirty years imprisonment for first-degree robbery, and death for capital murder. On appeal, appellant raises twenty-two points of error. We have reviewed all of appellant's points with great care. Only meritorious points will be discussed.

## II.

We first consider appellant's argument that the two counts of capital murder and one count of first-degree robbery were improperly joined. Prior to trial, defense counsel filed a motion to sever Counts I and II (charging capital murder of Winston Jones and armed criminal action) and Count III (charging capital murder of George Jones), and to sever Counts IV and V (charging robbery and armed criminal action) from Counts I, II and III. The motion was denied.

Appellant contends that Section 545.140.-2, RSMo Cum.Supp.1984 (effective August 13, 1984), does not apply in this case, that the charges against him were improperly joined under Rule 23.05 because his offenses were separate and distinct transactions, and alternatively, that the trial court abused its discretion under Rule 24.07 by refusing to sever the offenses for trial. Appellant further asserts that the trial court erred in submitting the punishment for robbery to the jury during the punishment phase of the trial.

### A.

Initially, appellant asserts that Section 545.140.2 is not applicable to this case. Instead, appellant argues that the joinder issue should be decided under Rule 23.05.[6] Under Rule 23.05, the propriety of joining two or more offenses in the same indictment or information depends upon the existence of a "common scheme or plan."

"[T]he essential test in determining whether a common scheme or plan exists, ... is the requirement that all the offenses charged must be '*products* of a single or continuing motive.'" (emphasis in original), *State v. McCrary*, 621 S.W.2d 266, 271 (Mo. banc 1981); *State v. Foerstel*, 674 S.W.2d 583, 589 (Mo.App.1984). For the reasons which follow, we need not determine whether Section 545.140.2 applies in this case.

---

**5.** Factual matters relating to the *Batson* issue will be discussed at V, *infra*.

**6.** Rule 23.05 states that:
 All offenses that are based on the same act or on two or more acts that are part of the same transaction or on two or more acts or transactions that constitute parts of a common scheme or plan may be charged in the same indictment or information in separate counts.

We believe that the offenses charged against appellant were the product of his continuing motive to kill George and Winston Jones. After appellant arrived at the restaurant, his first act was to ask the workers there whether they had seen George or Winston. When the men ignored his question, appellant decided to get their attention; he robbed them. He then left the restaurant and immediately went to Joy Jones' apartment, continuing the search for George and Winston he began at the restaurant. At the apartment he told Joy Jones that he was looking for her brothers and intended to kill them. Finding Winston at the apartment, appellant shot and killed him. Appellant continued his search for George, proceeding to a house known to him as one location from which the Jones brothers operated a drug business and at which he expected to find George. When George arrived, appellant pursued him at gunpoint, caught him and announced that he had killed Winston and was going to kill him. After the police arrested the two men and placed them in the paddy wagon, appellant maneuvered to place his handcuffs in front of his body. At the holding cell, appellant killed George.

This entire sequence of events took place in less than two hours. Each crime occurred within a short vicinity and short time of the other; all were linked by appellant's continuing motive to find and kill George and Winston Jones. Appellant's argument that these were separate, distinct, unconnected crimes is simply inconsistent with the facts in this case.

We find that each of the offenses was an act constituting a part of a common scheme or plan. All were properly joined under Rule 23.05.

### B.

■ The question of severance of properly joined offenses for trial rests in the discretion of the trial court. *McCrary*, 621 S.W.2d at 272; *State v. Williams*, 603 S.W. 2d 562, 567 (Mo.1980); Rule 24.07. In deciding a motion to sever, the court should determine whether prejudice to the defendant would result from joinder of all offenses in a single trial by considering "the number of offenses charged, the complexity of the evidence to be offered and whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense." *State v. Duren*, 556 S.W.2d 11, 20 (Mo. banc 1977), *rev'd on other grounds sub nom., Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *McCrary*, 621 S.W.2d at 272; *Foerstel*, 674 S.W.2d at 588.

■ Our review of this record does not reveal any abuse of discretion in the trial court overruling appellant's motion to sever. Only three offenses were charged against appellant. The evidence relevant to each was not overly complex. The jury received separate instructions on each count. The court submitted an instruction patterned after MAI–CR2d 2.70, limiting consideration of the evidence to each count.[7] The fact that the jury found appellant guilty of the lesser included offense of second-degree murder for the death of Winston Jones shows that the jury carefully considered the instructions and applied the law intelligently as to each offense.

No prejudice resulted from the trial court overruling the motion to sever. Appellant's point is denied.

### C.

■ Appellant also contends that the trial court committed instructional error by submitting the punishment for robbery to the jury during the punishment phase of the trial. MAI–CR2d does not specifically deal with the submission of punishment

---

7. Instruction No. 16 submitted by the court read:

The defendant is charged with a separate offense in each Count submitted to you. Each offense and the evidence and law applicable to it should be considered separately. Any evidence which was or has been limited to one of the offenses charged or one purpose should not be considered by you as to another offense charged for any purpose.

You may find the defendant guilty or not guilty on any or all of the Counts submitted against him.

You should render a separate verdict as to each Count submitted against the defendant.

alternatives to the jury. The opening instruction to be given the jury at the second stage of homicide trials states in pertinent part:

You have found the defendant guilty of (capital murder) (murder in the second degree) (manslaughter). At this stage of the trial it will be your duty to determine within the limits prescribed by law the punishment which must be imposed for that offense.

MAI–CR2d 15.30. During the punishment phase of appellant's trial, the trial court gave three separate opening instructions, the first reflecting the jury's finding of guilt to second-degree murder, the second reflecting a finding of guilt to robbery in the first degree,[8] and the third reflecting a finding of guilt to capital murder. Appellant argues that the modification of MAI–CR2d 15.30 to refer to the offense of robbery is not only unauthorized under MAI–CR2d directives[9] but contrary to the statutory procedure regarding punishment[10] as well.

Even assuming error *arguendo*, we find no prejudice to appellant by the modification of MAI–CR2d 15.30. Neither do we find prejudice in submitting the penalty for robbery during the punishment phase of trial. The burden is on appellant to show prejudice; he has not done so. On this record there is no evidence that the jury was in any way confused by submission of the robbery count and the homicide counts because of the penalties involved. The instructions were given separately and the penalties imposed by the jury were neither inconsistent with the law nor excessive under the circumstances. Finding no prejudice, we deny the point.

**8.** The instruction read:
You have found the defendant guilty under Count III of Robbery in the First Degree. At this stage of the trial it will be your duty to determine within the limits prescribed by law the punishment which must be imposed for that offense.
The punishment by law for Robbery in the First Degree is life imprisonment or imprisonment for a term of years fixed by you, but not less than ten years and not to exceed thirty years.

### III.
Appellant next raises several points of error focusing on the jury selection process.

### A.
Appellant first objects to the detail with which the state was allowed to present the facts of the case on voir dire.

■ A defendant has the right to an impartial jury—a jury which decides the case on the evidence presented at trial, not on information gleaned from some external source. U.S. Const. Amend. VI; *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In order to protect this right, the Court and the parties must determine a prospective juror's personal knowledge of the crime or his exposure to pretrial publicity. Revelation of some portion of the facts of a case on voir dire is necessary to make this determination. An insufficient description of the facts jeopardize appellant's right to an impartial jury.

We do not permit counsel, however, to try the case on voir dire by a presentation of the facts in explicit detail. *State v. Wilkerson,* 616 S.W.2d 829, 834 (Mo. banc 1981). Nor is voir dire an appropriate occasion for argument. *State v. Henderson,* 547 S.W.2d 141, 143 (Mo.App.1976).

A balance must be struck implicating both due process concerns and the requirements of the individual case. The trial judge is in the best position to determine whether a disclosure of facts on voir dire is sufficient to assure the defendant of an impartial jury without, at the same time, being tantamount to a presentation of evi-

**9.** *See* Instructions for Use, MAI–CR2d Volume I, p. XV, XVI.

**10.** Section 557.036, RSMo Cum.Supp.1984, applicable to the robbery count, provides that the court shall instruct the jury as to the range of punishment authorized by statute and upon a finding of guilt to assess and declare the punishment as part of their verdict. *See* MAI–CR2d 23.02.

dence. The discretion of the trial judge in striking this difficult balance will be upheld, absent abuse.

 Appellant urges that the trial judge abused his discretion. We disagree. The party asserting abuse of the trial court's discretion in controlling the manner and extent of questioning on voir dire has the burden of demonstrating "a real probability that he was thereby prejudiced." *State v. Norton,* 681 S.W.2d 497, 498 (Mo. App.1984). In reviewing the record in this case, we find that the factual presentation given by the State was neither too lengthy nor overly detailed. Appellant fails to identify any statements by the State that were either argumentative or prejudicial in the context in which they were made. There being no prejudice to appellant, the point is denied.

### B.

Appellant's more significant contention regarding the State's factual presentation on voir dire concerns the subsequent death-qualification of the prospective jurors. He argues that the manner in which the State conducted the death-qualification process predisposed the jury to vote for the death penalty in violation of due process and right to a trial by a fair and impartial jury.

After the facts were presented and questioning was had of several venirepersons who indicated their familiarity with the case, the State proceeded as follows:

MR. DAKOPOLOS: Now, in this state, the law is that should a person be found guilty of capital murder, there are only two sentences that can be imposed on a defendant. One is life imprisonment with no possibility of probation or parole until he has served a minimum of 50 years in the Missouri Division of Corrections. The other is death.

Is there anyone on the panel, because of personal, moral or religious reasons, who, because of those reasons, would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of this case before you? If I could see a show of hands on that. Did everyone understand my question?

Anyone here in the jury box that would automatically vote against the imposition of the capital punishment, irregardless of the circumstances of the case? How about back there? Yes ma'am?

VENIREPERSON MARCY BROWN: I don't know if I was included back there or not. I think I might, yes.

MR. DAKOPOLOS: We'll come back to you later. I just want a show of hands at this time. Anyone else?

My next question, is there anyone on the panel whose attitude toward the death penalty would prevent them from making a fair and impartial decision as to this defendant's guilt? Any hands on that?

After a show of hands, the State was permitted over objection to ask an additional question:

MR. DAKOPOLOS: Now, the reason I asked these two previous questions about the imposition of the death penalty is that in the event the jury is ultimately selected and should find this defendant guilty of capital murder, the State will, in fact, be asking that the jury impose the death penalty.

Now, other than the hands that I've already seen, does that cause anyone else to change their mind in that regard?

 The State may not hypothesize a set of facts and then ask the prospective jurors how they would vote under those facts. *State v. Pinkston,* 336 Mo. 614, 79 S.W.2d 1046, 1048–49 (1935). Appellant argues that the State's initial factual presentation, when coupled with advisement to the jury during the death-qualification process that it would be asking for the death penalty should the jury "find this defendant guilty of capital murder," achieved this forbidden result. We disagree.

In support of his argument that the State may not question veniremen about their ability to impose the death penalty in the case before them, appellant relies on *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), *Adams v. Tex-*

*as,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), and *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Contrary to appellant's assertion, these decisions point to the conclusion that disclosure of a certain amount of factual information is necessary to determine whether veniremen will act fairly and impartially in the case at hand.

In *Witherspoon,* the Supreme Court noted that while a prospective juror cannot be expected to say in advance of trial whether he would vote for the death penalty in the case before him, he must "be willing to *consider* all of the penalties provided by state law, and ... not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21 (emphasis in original). In *Adams,* the Court simplified the two-part *Witherspoon* test for juror exclusion[11] to one which seeks to determine whether the juror's views about capital punishment "would prevent or substantially impair the performance of his duties ... in accordance with his instructions and his oath." 448 U.S. at 45, 100 S.Ct. at 2526. This test was later affirmed in *Wainwright,* where the Court stated that as with any other trial situation where a party seeks to exclude a biased juror, "it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality." 469 U.S. at 423, 105 S.Ct. at 852.

In *State v. Johns,* 679 S.W.2d 253 (Mo. banc 1984), this Court concluded that a venireman who was unequivocally opposed to the death penalty in that case but who stated that she might be willing to consider it in some cases was not immune from exclusion. Jurors must be able to apply the law fairly and impartially to the facts they will learn at trial. "If she knows

enough about the case to know that she could not consider imposition of the death penalty regardless of what evidence might be presented, she must be excused." 679 S.W.2d at 265, *quoting Williams v. Maggio,* 679 F.2d 381, 386 (5th Cir.1982), *cert. denied,* 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983).

The very purpose of voir dire is to examine prospective jurors to discover their state of mind. From that examination it is possible to determine which persons harbor bias or prejudice against either party which would make them unfit to serve as jurors in the case before them. In a capital murder case, inquiry into the venire members' views about the death penalty is of critical importance to the state, the defendant and the court. It is the duty of all concerned to investigate those views thoroughly in order to assemble the most qualified jury. *See State v. Smith,* 649 S.W.2d 417, 428 (Mo. banc 1983).

It is not outside the realm of possibility for a person who expresses general support of the death penalty to reconsider that position when faced with the prospect of imposing that penalty personally. The State's initial reference to the facts and inquiry as to whether the prospective jurors could impose the death penalty in the case before them was not a request for commitment, but a proper investigation into whether the prospective jurors could consider all penalties, including death, regardless of the facts and circumstances later adduced at trial.

### C.

■■ Appellant further argues that certain members of the venire who expressed opposition to the death penalty were erroneously removed for cause. The trial court possesses considerable discretion in ruling on challenges to members of the venire for cause. Absent a clear abuse of discretion,

---

**11.** Under the *Witherspoon* standard, jurors were properly excluded for cause if they made it unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.* 391 U.S. at 522–23 n. 21, 88 S.Ct. at 1776–77 n. 21 (emphasis in original).

the trial court's rulings will not be disturbed on appeal. *Smith*, 649 S.W.2d at 422. *See State v. Battle*, 661 S.W.2d 487, 491 (Mo. banc 1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984); *State v. Stokes*, 638 S.W.2d 715, 721 (Mo. banc 1982), *cert. denied*, 460 U.S. 1017, 103 S.Ct. 1263, 75 L.Ed.2d 488 (1983).

### 1.

The first two members of the venire excluded for cause were Patricia Briggs and Grover Garrett. Each was questioned individually in chambers after responding to the general inquiries regarding the death penalty asked of the entire panel. Both initially stated that they would be unable to consider imposing the death penalty regardless of the facts and circumstances adduced at trial. In his attempt to rehabilitate Ms. Briggs, the defense counsel presented her with the following hypothetical fact situation:

MR. BROWN: Are you saying that if you were presented with a set of facts where, say for instance, a small child was brutally murdered and you were on the jury and you found the person was guilty of capital murder, you're saying that in a situation like that, you could consider the death penalty?

VENIREPERSON BRIGGS: I'm just saying maybe. I couldn't say yes. I still couldn't say yes. I just—

MR. BROWN: I'm not asking if you could, in fact, go on and do it, but could you consider doing it?

VENIREPERSON BRIGGS: Yes, I could consider it.

Similarly, after Mr. Garrett responded positively to the State's questions about whether his attitude toward the death penalty would make it impossible for him to render a fair and impartial decision, the defense counsel asked: "If, for instance, if you were on the jury and you found Adolf Hitler guilty of capital murder, could you consider it in that situation?" In answer to this hypothetical situation, Mr. Garrett hesitatingly responded: "I—I believe so."

In *Wainwright*, the Supreme Court observed that:

[I]n addition to dispensing with *Witherspoon's* reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determination of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear".... Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.

469 U.S. at 424–26, 105 S.Ct. at 852–53. We have consistently recognized the trial judge's superior position to interpret and evaluate the totality of a venireman's verbal and nonverbal responses when actually heard and seen—an evaluation which cannot be readily made from a cold record. *Smith*, 649 S.W.2d at 422.

Both Briggs and Garrett initially expressed unequivocal opposition to imposing the death penalty in the case before them. The fact that each indicated a willingness to consider the death penalty in the extreme hypothetical situation presented by the defense counsel is not a basis for rendering either of them immune from exclusion from the jury for cause. *Johns*, 679 S.W.2d at 264–65.

### 2.

Appellant also challenges the exclusion of venireman Anna May, who expressed her position during individual questioning as follows:

MR. DAKOPOLOS: A personal belief. And because of this personal belief, would you find it impossible to listen to the evidence and render a fair and impartial verdict in the case because of this belief against the death penalty?

VENIREPERSON MAY: I think I might, yes.

MR. DAKOPOLOS: Well, you say you think you might. And, of course, the Court and the attorneys would like as definite a response as you can give us.

VENIREPERSON MAY: I guess I would be.

MR. DAKOPOLOS: And would that be—would your answer be the same irregardless of what the facts or circumstances of this case might prove to be during the trial of the case?

VENIREPERSON MAY: Yes.

MR. DAKOPOLOS: And would your answer be the same in any case where the State is seeking a death penalty?

VENIREPERSON MAY: Yes.

MR. DAKOPOLOS: Irregardless of the facts of this particular case?

VENIREPERSON MAY: Yes, I think it would.

MR. DAKOPOLOS: Any heinous killing of any kind, you still—

VENIREPERSON MAY: Well, when I am involved personally, yes, I think it would. I'd have an awful hard time with it.

MR. DAKOPOLOS: But in any case that you can imagine, your attitude is such that you would not be able to render a fair and impartial verdict because of your belief against imposing the death penalty; is that correct?

VENIREPERSON MAY: Yes.

The fact that the answers given by May were not unmistakably clear does not render her immune from exclusion. Even from the sterility of the printed page, it is clear that May's answers could well have left the trial judge with the definite impression that her attitude toward the death penalty would prevent her from rendering a fair and impartial verdict in this case. We find no abuse of discretion in excluding her from the jury.

### IV.

■ Appellant next claims that the trial court erred in giving MAI–CR2d 1.02, 2.20 and 15.38. Appellant urges that these instructions improperly define proof beyond a reasonable doubt as proof which leaves the jury "firmly convinced" of the defendant's guilt.

Effective October 1, 1984, the General Assembly required courts of this state to instruct juries on the definition of reasonable doubt in criminal cases. Section 546.-070(4), RSMo Cum.Supp.1984. In compliance with the statutory directive, this Court modified MAI–CR2d 1.02, 2.20 and 15.38 to include the following definition:

A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. The law does not require proof that overcomes every possible doubt. If, after your consideration of all the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you will find him guilty. If you are not so convinced, you must give him the benefit of the doubt and find him not guilty.

Appellant contends, without citation to any specific supporting authority, that use of the phrase "firmly convinced" lowers the burden of proof required of the State in criminal cases to something else than beyond a reasonable doubt, in violation of appellant's right of due process. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt....") We disagree and having fully considered the constitutional mandates regarding the burdens of proof, we find no reason to reconsider the definition now.

The "firmly convinced" language contained in the MAI definition is not new. It is substantially the same as that found in the federal instructions,[12] and has been em-

---

**12.** The federal definition states in pertinent part:

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt.... If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If,

ployed in federal and state courts alike.[13] It is intended to assist lay jurors in their understanding of the legal phrase "beyond a reasonable doubt." The instruction achieves that purpose; in our view, "firmly convinced" is essentially synonymous with "beyond a reasonable doubt."

Any doubt about the validity of the "firmly convinced" language instruction is removed when it is considered in context. "A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). MAI–CR2d 2.20 informs the jury that "the defendant is presumed to be innocent" and that "the state [bears] the burden of proving beyond a reasonable doubt that the defendant is guilty." Read as a whole, MAI–CR2d 2.20 properly instructs the jurors of their duty in evaluating the evidence and making a determination of guilt or innocence. Appellant's point is denied.

## V.

Appellant argues that the trial court erred in failing to quash the jury panel because the State engaged in a systematic pattern of excluding qualified black veniremen from the jury in violation of appellant's Fourteenth and Sixth Amendments rights to equal protection and to a jury selected from a fair cross-section of the community.

### A.

In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court ruled

> that a defendant in a state criminal trial could establish a prima facie case of racial discrimination violative of the Fourteenth Amendment, based on the prosecution's use of peremptory challenges to

strike members of the defendant's race from the jury venire, and that, once the defendant had made the prima facie showing, the burden shifted to the prosecution to come forward with a neutral explanation for those challenges.

*Griffith v. Kentucky,* 479 U.S. ——, ——, 107 S.Ct. 708, 710, 93 L.Ed.2d 649 (1987). *Griffith* applies *Batson* to criminal prosecutions "pending on direct review or not yet final" when *Batson* was decided. *Griffith,* 479 U.S. at ——, 107 S.Ct. at 710. Because this case was on direct appeal when *Batson* was decided, *Batson* controls here.

In this case, we are called to participate in the continuing process of defining the contours of the *Batson* holding, 476 U.S. at 101, 106 S.Ct. at 1725 (White, J., concurring). Specifically, our task is twofold: First, we must provide guidance to our trial courts in deciding *Batson* issues. Second, we are required to define the appropriate standard of review on appeal of *Batson* questions.

### 1.

*Batson* intimates that it should be read side-by-side with the Supreme Court's Title VII cases. *Id.,* 476 U.S. at 94, n. 18, 106 S.Ct. at 1721, n. 18. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Read together, these cases provide a relatively focused picture of the procedural requirements of *Batson* at the trial level.

 The ultimate burden of persuasion lies with and never shifts from the defendant. *Burdine,* 450 U.S. at 252–256, 101 S.Ct. at 1093–95. A defendant may "rely on the fact ... that peremptory challenges

on the other hand, you think that there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.
Federal Judicial Center Committee to Study Criminal Jury Instructions, *Pattern Criminal*

*Jury Instruction* No. 21 (Federal Judicial Center 1982).

13. *See United States v. Hunt,* 794 F.2d 1095, 1100 (5th Cir.1986); *United States v. Bustillo,* 789 F.2d 1364, 1368 (9th Cir.1986). *Accord State v. Clark,* 446 So.2d 293, 299 n. 2 (La.1984).

constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate'." *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723, *citing Avery v. Georgia,* 345 U.S. 559, 562, 73 S.Ct. 891, 97 L.Ed. 1244 (1953), and may establish a prima facie case of discrimination by showing that (1) defendant is a member of a cognizable racial group, (2) that the prosecutor has exercised peremptory challenges to remove members of the defendant's race from the venire, and (3) that "these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723.

Defendant's establishment of a prima facie case creates a rebuttable presumption that the prosecutor exercised his peremptory challenges in a discriminatory manner. *Burdine,* 450 U.S. at 254, n. 7, 101 S.Ct. at 1094, n. 7. The burden of production then shifts to the State to rebut the presumption of discrimination by coming forward with a neutral explanation for challenging black jurors. *Batson,* 476 U.S. 97, 106 S.Ct. at 1723. The proffered neutral explanation "must give a 'clear and reasonably specific' explanation of the State's 'legitimate reason' for exercising the challenges." *Batson,* 476 U.S. at 99, n. 20, 106 S.Ct. at 1724, n. 20, *citing Burdine,* 450 U.S. at 258, 101 S.Ct. at 1096.

If the State comes forth with a neutral explanation, "the presumption raised by the prima facie case is rebutted [footnote omitted] and the factual inquiry proceeds to a new level of specificity." *Burdine,* 457 U.S. at 255, 101 S.Ct. at 1094. Defendant now has the obligation to demonstrate that the State's explanations are merely pretextual and, thus, not the true reason for the use of the State's peremptory challenges.

■ As a practical matter, the third element of the prima facie case under *Batson*—"facts and any other relevant circumstances raise an inference that the prosecutor used [his peremptory challenges] to exclude the veniremen from the petit jury on account of their race"—requires the trial court to consider the State's explanation of the manner in which it employed its challenges prior to making a final determination as to whether a prima facie case exists. We must therefore direct our trial judges to consider the prosecutor's explanations as part of the process of determining whether a defendant has established a prima facie case of racially discriminatory use of peremptory challenges.

A judgment as to the validity of the State's "neutral explanation" presents the trial judge with a particularly troubling task. Jury selection is, after all, an art and not a science. By their very nature, peremptory challenges require subjective evaluations of veniremen by counsel. Counsel must rely upon perceptions of attitudes based upon demeanor, gender, ethnic background, employment, marital status, age, economic status, social position, religion, and many other fundamental background facts. There is, of course, no assurance that perceptions drawn within the limited context of voir dire will be totally accurate. Counsel simply draws perceptions upon which he acts in determining the use of peremptory challenges.

*Batson* declares unacceptable only those perceptions based upon race. In so doing, *Batson* requires trial judges to measure the subjective decisions of counsel against a constitutional standard.

The trial judge's task is extremely difficult. One doubts that a prosecutor will admit that his decision to challenge a particular member of the venire was based upon race. The court is left with determining from the totality of circumstances whether an articulated neutral explanation is but an excuse for improper discrimination. *Batson* thus requires the trial judge to embrace a participatory role in voir dire, noting the subtle nuance of both verbal and nonverbal communication from each member of the venire and from the prosecutor himself.

■ *State v. Butler,* 731 S.W.2d 265 (Mo.App.1987), adopts a well-reasoned three-pronged analysis of the trial judge's obligation to assess the explanations provided by the prosecutor.

First, the susceptibility of the particular case to racial discrimination may be evaluated. [citations omitted.] The court may consider the race of the victims and primary witnesses. For example, the fact that the key witnesses for both sides are black 'would discount any advantage that a discriminating prosecutor might perceive in striking blacks from the jury.' *[United States v.] Mathews,* [803 F.2d 325, 332 (7th Cir.1986)]. Second, the prosecutor's demeanor may be relevant. [citations omitted.] Is the prosecutor "engaging in a process of careful deliberation based on many factors" during voir dire or has he failed to "engage these same jurors in more than desultory voir dire or indeed to ask them any questions at all?" *Mathews,* 803 F.2d at 332.... Finally, the trial court should evaluate the explanation itself.

*Butler,* 731 S.W.2d at 269. As to the third *Butler* prong, the court properly suggests that objective criteria are available to evaluate the explanation offered by the State. The trial judge should consider whether similarly situated white veniremen escaped the State's challenges. The trial court should also consider the relevance of the State's justification for challenging a particular venireman to the kind of crime charged, the nature of the evidence to be adduced by both parties and the potential punishment which a guilty verdict may produce. The trial court evaluated the "racial context" of the case. This assessment requires consideration of the case of the witnesses, the victim and the defendant, among other factors.

■ *Butler* seems to require reversal whenever a trait other than race is identified by the State as the explanation for its use of a peremptory challenge against a black juror, unless the trait applies specifically to the juror, is carefully tailored to the facts of the case and is objectively provable. *Butler,* 731 S.W.2d at 271. *Batson* states unequivocally, however, that the State's "explanation need not rise to the level of justifying exercise of a challenge for cause." *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723. And we believe that *Batson* leaves room for the State to

exercise its peremptory challenges on the basis of the prosecutor's legitimate "hunches" and past experience, so long as racial discrimination is not the motive. We do not, therefore, adopt the holding of *Butler* that only objectively supportable explanations for its use of peremptory challenges survive a *Batson* challenge.

We do not believe, however, that *Batson* is satisfied by "neutral explanations" which are no more than facially legitimate, reasonably specific and clear. Were facially neutral explanations sufficient without more, *Batson* would be meaningless. It would take little effort for prosecutors who are of such a mind to adopt rote "neutral explanations" which bear facial legitimacy but conceal a discriminatory motive. We do not believe the Supreme Court intended a charade when it announced *Batson.*

■ *Batson* recognizes the subjective nature of peremptory challenges and permits their continued use in criminal proceedings. At the same time, *Batson* strictly prohibits the use of peremptory challenges in a racially discriminatory manner. Therefore, we read *Batson* to require the trial judge to assess the entire milieu of the voir dire objectively and subjectively. The judge must consider his personal, lifetime experiences with voir dire, comparing his observations and assessments of veniremen with those explained by the State. In addition, he must consider both his personal experiences with the prosecutor and any evidence offered by a defendant to show a pattern or practice of a prosecutor using peremptory challenges in a racially discriminatory manner over the course of time. Other factors must be considered as circumstances demand.

Ultimately, however, the trial judge must focus all of the information and intuitive perceptions he has gathered to determine whether the prosecutor's use of his peremptory challenges proceeds from a racially discriminatory motive. We thus place great responsibility in our trial judges, confident that they, "experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's

use of peremptory challenges creates a prima facie case of discrimination against black jurors." *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723.

2.

We turn now to consider the standard for appellate review of *Batson* issues.

A finding of discrimination, or a finding of no discrimination, is a finding of fact. *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). In a *Batson* context, the Supreme Court observed that because the trial judge's findings "largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson,* 476 U.S. at 98, n. 21, 106 S.Ct. at 1724, n. 21. "[F]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses." *Anderson,* 470 U.S. at 573, 105 S.Ct. at 1511, *quoting* F.R.C.P. 52(a).

"[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson,* 470 U.S. 573, 105 S.Ct. at 1511, *citing United States v. United States Gypsum,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). Thus, if the trial court's "account of the evidence is plausible in light of the record viewed in its entirety, [an appellate] court may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.,* 105 S.Ct. at 1512.

B.

██ Against this background, we evaluate the trial court's findings with regard to the *Batson* issue in this case.

The parties stipulated that appellant is a member of the black race. Seventy persons were called as members of the venire panel in the case. Following motions to strike for cause, a qualified panel of thirty-four veniremen remained. Of these thirty-four, three were members of the black race. Both the State and defendant were permitted to exercise nine peremptory challenges and one alternate peremptory challenge. The State used three of its peremptory challenges to strike the black members of the venire. The final jury of twelve jurors and two alternate jurors contained no members of the black race. Appellant asserted that the State used its peremptory challenges to strike all members of the black race from the venire.

The three black members of the qualified venire were Judy A. Williams, Jewel E. Carter, and Lynette W. Koontz. The State challenged all three. During voir dire, Williams indicated that her "daughter's father was presently serving time in the penitentiary." In response to the same question, a white venireman, Mary Devasher, stated that her two stepsons were incarcerated in the penitentiary. The State exercised peremptory challenges to remove both Williams and Devasher. The prosecutor explained that his challenges proceeded from the belief that persons who have close relatives in the penitentiary are not favorable State's jurors in a case in which the State seeks the death penalty. No other veniremen had relatives or friends in the penitentiary.

The trial court found that the State struck all persons similarly situated to Williams and that the explanation as to Williams was legitimate, clear, reasonably specific and not motivated by racial animus.

The State also struck black venireman Jewel Carter, who stated that she had been the victim of several burglaries for which no one was ever apprehended. She also claimed to have been a rape victim. No other member of the venire had been the victim of a sex crime, although two white veniremen, Carl McCloud and Henry Record, admitted that they too had been victims of a crime.[14] The prosecutor explained that he challenged Carter on account of his previous experience with vic-

14. Appellant used his peremptory challenges to remove McCloud and Record.

tims of sexually related crimes as jurors; in the prosecutor's view, victims of sex crimes have spent an inordinate amount of time in the criminal justice system, tend to be disillusioned with the system and are not good jurors. Appellant argues that the State's explanation does not apply specifically to the particular facts of the case being tried and is thus, pretextual.

As we have previously said, the exercise of peremptory challenges is the product of the subjective analyses of a wide variety of character and personality traits perceived by counsel. *Batson* does not prohibit "hunch" challenges so long as racial animus is not the motive.

In this case, the trial court had the opportunity to assess the prosecutor's demeanor, the breadth of his questioning of all members of the venire, and the use to which the State puts its peremptory challenges. The trial court also found that appellant, both of his victims, and the majority of witnesses in the case were black. This fact discounts "any advantage that a discriminating prosecutor might perceive in striking blacks from the jury." *Mathews*, 803 F.2d at 332. The "racial context" of this case, together with the trial judge's assessment of the prosecutor's motive, supports the trial court's conclusion that the State did not challenge Carter as a result of a discriminatory intent.

Finally, the State challenged Annette Koontz, claiming that she was inattentive during voir dire examination. The State also challenged Helen Handly, a white person, on account of inattentiveness. The trial court's own observation of Koontz' demeanor during voir dire supports the State's conclusions as to her lack of attentiveness.

The trial court found that appellant failed to establish a prima facie case of discrimination. The record reveals legitimate, non-pretextual, neutral explanations for State's use of its preliminary challenges against the three Black members of the venire. The explanations proffered by the State are clear, reasonably specific, and legitimate. The "racial context" of the case provides no basis for advantage to the State in using peremptory challenges in a discriminatory manner. The trial court's conclusion is not clearly erroneous. The point is denied.

### C.

■■■ Appellant next asserts that the trial court erred in overruling his motion to compel the prosecutor to disclose his trial notes taken during voir dire. Appellant theorizes that these notes could be useful in corroborating or impeaching explanations offered by the prosecutor for his use of peremptory challenges. An attorney's opinions, theories and conclusions are work product and are therefore privileged. *State v. Carter*, 641 S.W.2d 54, 59 (Mo. banc 1982). The impressions formed by a prosecuting attorney during voir dire constitute his opinions. *Batson* does not create an exception to the work product privilege.

Apparently out of an abundance of caution, the trial court conducted an in-camera review of the prosecutor's notes taken in connection with the voir dire examination. The court found that these notes contained no comments or markings with regard to race other than coded markings identified and explained by the prosecution in open court. We find no error in the trial court's ruling denying appellant discovery of the prosecutor's trial notes. The point is denied.

### VI.

Appellant next lodges two challenges to the State's use of his post-arrest silence for purposes of impeachment.

### A.

In *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), the Supreme Court exercised its supervisory power over the federal courts and declared that a criminal defendant's silence after receiving warnings required in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was sufficiently ambiguous as to have little probative value. In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240,

49 L.Ed.2d 91 (1976), the Supreme Court held that a criminal defendant's due process is violated when the State comments on his silence *after* receiving *Miranda* warnings. The court reasoned that the *Miranda* warnings contain an implicit assurance that a person's silence will not be used against him. *See Colorado v. Connelly,* —— U.S. ——, ——, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986) ("The sole concern of the Fifth Amendment, on which *Miranda* was based is government coercion"). Thus, *Doyle* turned on the criminal defendant's reliance on the implied assurances of the *Miranda* warnings.

*Doyle* does not apply, however, when a criminal defendant voluntarily speaks after receiving *Miranda* warnings. In such a circumstance, the *Miranda* warnings have not acted as an inducement to remain silent nor is there reliance on the implicit assurance that a person's silence will not be used against him.

In *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), defendant Charles made a statement after receiving his *Miranda* warnings. Charles had been arrested while driving a stolen car. The car belonged to an individual who had been strangled to death in his Ann Arbor, Michigan home less than a week earlier. Circumstantial evidence linked Charles to the murder. After his arrest, and after receiving his *Miranda* warnings, Charles told the police that he had stolen the car in Ann Arbor, approximately two miles from the local bus station. At trial, however, Charles testified that he had stolen the car from a business establishment next door to the bus station. On cross-examination, the prosecutor asked, "Don't you think it's rather odd that if it were the truth [that you had stolen the car next door to the bus station] that you didn't come forward and tell anybody at the time you were arrested, where you got the car?" The Supreme Court held that *"Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warn-

ings has not been induced to remain silent." 447 U.S. at 408, 100 S.Ct. at 2182.

■ Similarly, in the absence of the affirmative assurances embodied in the *Miranda* warnings, it does not violate due process for a state to permit cross-examination of a criminal defendant who chooses to take the stand as to his post-arrest silence prior to receiving *Miranda* warnings. "A State is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony." *Fletcher v. Weir*, 455 U.S. 603, 607, 102 S.Ct. 1309, 1312, 71 L.Ed.2d 490 (1982).

### B.

Appellant urges that the trial court erred when it permitted the State to cross-examine and impeach him regarding his failure to make an exculpatory statement to the police immediately upon arrest. On cross-examination, the State sought to impeach appellant's testimony that he was looking for George and Winston Jones in order to tell them of his intention to get out of their drug operation, and that after he had shot Winston in self-defense, he decided to turn himself in. The following exchange took place:

Q. (By Mr. Dakopolos) And you wanted to clear yourself, and yet there are three police officers there and you don't tell them anything about the robbery at 2108 Vine, about the shooting at the Lincoln Garden Apartment, did you?

A. I explained to them that he was a dope dealer and—

Q. But you didn't tell them anything about the shooting of Winston Jones, did you?

A. They didn't ask me.

Q. But I thought you wanted to clear yourself and claim that it was self-defense. You had three police officers right there. You didn't say a word about Winston Jones, did you?

A. They wasn't really talking to me.

Q. I thought you were going to go to the police station and tell them.

A. I was going to—back to the apartment at Lincoln Gardens to find out what happened to George's brother, Winston.

No objection was interposed by defense counsel during this exchange. We review for plain error.

Nothing in the record indicates, nor does appellant allege, that appellant was given *Miranda* warnings immediately upon his arrest at 34th and Prospect. In the absence of the implicit assurance of *Miranda*, appellant was under no inducement to remain silent. *Fletcher* precludes appellant's claim of error on federal constitutional grounds.

Under *Fletcher*, the validity of appellant's claim turns on whether Missouri law permits impeachment with post-arrest, pre-*Miranda* warning silence. Appellant relies on *State v. Mathenia*, 702 S.W.2d 840 (Mo. banc 1986), *cert. denied*, 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986), and *State v. Stuart*, 456 S.W.2d 19 (Mo. banc 1970), for the proposition that Missouri law does not permit impeachment with post-arrest silence.

The cases upon which appellant relies each involve a criminal defendant who was given a *Miranda*-type warning. In each case, the prosecutor attempted to make use of post-*Miranda* warning silence. Because no *Miranda* warnings had been given this appellant at the time his silence formed the basis for impeachment, we find the cases upon which appellant relies distinguishable.

 Appellant testified that he had decided to turn himself into the police and tell everything he knew about the Jones brothers' drug business. He further testified that he made that decision prior to his encounter with George at the drug house and that only George's arrival and subsequent events prevented him from going to the police station. Given the commitment to this mission which appellant expressed at trial, it is nearly inconceivable that he would have remained silent when the police found him.

Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would

have been asserted. 3A J. Wigmore, Evidence sec. 1042, p. 1056 (Chadbourn rev. 1970). Each jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative. *Fletcher*, 455 U.S. at 606, 102 S.Ct. at 1311. We hold that under Missouri law it is permissible for the State to use a criminal defendant's immediate post-arrest, pre-*Miranda* warning silence for purposes of impeaching his testimony when a neutral expectancy of an exculpatory statement exists as a result of a defendant's testimony and defendant's silence is probative of inconsistencies in that testimony.

Because appellant's testimony raised a natural and reasonable expectation that he would have made an exculpatory statement at the time of his arrest, we believe the State's questions regarding appellant's silence at the time of his arrest as to the events of the day were probative of an inconsistency in his testimony at trial. The trial court committed no error, plain or otherwise, in allowing the impeachment challenged by the appellant.

C.

During closing argument, the State made several remarks over objection concerning appellant's silence following arrest at 34th and Prospect and prior to appellant receiving *Miranda* warnings. Initially, we reaffirm settled law that the trial court possesses broad discretion in controlling closing argument. *State v. McDonald*, 661 S.W.2d 497, 506 (Mo. banc 1983), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985); *State v. Gilbert*, 636 S.W.2d 940, 943 (Mo. banc 1982). The court's discretion in allowing or rejecting argument of counsel is reversible only when there is an abuse of discretion where the argument is plainly unwarranted. *State v. Armbruster*, 641 S.W.2d 763, 766 (Mo.1982). Appellant's challenge to the closing remarks of the prosecutor regarding his silence following arrest but before receiving *Miranda* warnings fails for the reasons stated in VI, B, *supra*.

### D.

Appellant argues that the trial court erred in permitting the State to cross-examine him concerning his testimony that certain portions of his post-arrest, post-*Miranda* statement were inaccurately transcribed, and his failure to inform the police of the inaccuracies.

After inflicting George Jones' mortal wounds in the holding cell, appellant was taken to an interview room and given *Miranda* warnings. After signing a written waiver of his right to remain silent and to the presence of counsel, appellant gave his statement to Detective Clarence E. Gibson. The statement was transcribed and subsequently read into evidence by Gibson at trial as part of the State's case in chief.

At trial, defendant chose to testify in his own behalf. On direct examination, appellant testified to an exculpatory version of events inconsistent with the written statement read by Detective Gibson. Under cross-examination, appellant testified that portions of the statement transcribed by Detective Gibson were incorrect. The prosecutor asked, "Well, have you ever told anybody that they weren't true and correct?" Appellant responded that he had told his attorney of the alleged inaccuracies after he had received a copy of the statement approximately one year before trial. Thereafter, the prosecutor commented on the fact that neither appellant nor his attorney had informed anyone prior to trial that the statement previously taken by Detective Gibson was inaccurate. Appellant relies on *Doyle*, 426 U.S. 610, 96 S.Ct. at 2240, for the proposition that this exchange is an unconstitutional use of post-arrest silence in violation of his Fifth Amendment rights. We disagree.

■ This case does not involve a defendant who maintained silence after receipt of government assurances. Instead, appellant voluntarily chose to give a statement after his arrest, later testified at trial that the statement was inaccurately transcribed, and gave a version of events different from that contained in the statement. Because a defendant "who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent," he may be impeached with prior inconsistent statements. *Anderson*, 447 U.S. at 408, 100 S.Ct. at 2182; *State v. Van Doren*, 657 S.W.2d 708, 715–16 (Mo.App. 1983). Similarly, having elected to make a statement to the police, a defendant who remained "selectively silent" may be impeached by omissions in that statement. *State v. Trice*, 575 S.W.2d 739, 742 (Mo. App.1979).

■ The "silence" appellant claims was improperly used by the State in this case was appellant's failure to correct the alleged inaccuracies of his voluntary statement to the police. We find no indication that such "silence" was in any way induced by the implicit assurances of the *Miranda* warnings. Furthermore, appellant is not claiming that his statement to the police was false at the time he gave it. His argument is that his post-*Miranda* statement was inaccurately transcribed by Detective Gibson. The prosecutor's question did not make inquiry regarding appellant's "silence" but focused on the accuracy of appellant's statement. The State's question was proper impeachment.

■ Appellant's argument assumes that the right to remain silent is automatically reinstated when a criminal defendant, who waives the right, ceases speaking. While it is true that a defendant may assert his right to remain silent at any point during an interrogation, even following an initial waiver of the right, it does not follow that the right is automatically reasserted at the close of the interrogation. We believe that once the right to remain silent is waived, the waiver continues unless the right to remain silent is affirmatively invoked by a defendant. Absent an affirmative reassertion of the right to remain silent, there is no reliance on the implicit assurances of *Miranda* warnings that silence will carry no penalty.

We find no error in the prosecutor's impeachment of appellant's testimony that the recording of his statement by Detective Gibson was not accurate.

## VII.

Appellant next takes issue with the trial court's failure to sustain an objection to the State's closing argument during the punishment phase of trial that if the death penalty were not imposed, appellant would pose a danger to other inmates and corrections personnel.[15] Such an argument, he contends, went beyond the evidence and created such passion and prejudice that he is entitled to a new trial and to have the death sentence set aside.

### A.

Under Missouri law, a criminal defendant found guilty of capital murder is entitled to a presentence hearing before the jury which determined his guilt. At the presentence hearing, "the only issue shall be the determination of the punishment to be imposed." Section 565.006.2, RSMo (now Section 565.030.4, RSMo Cum.Supp.1984). Appellant argues that the State may not argue a defendant's criminal proclivities at the punishment phase of the trial.

We believe this is a question of first impression. Our cases hold that while the State may argue for a severe penalty as a deterrent to others, it may not argue the necessity of deterring the defendant on trial from committing future crimes. *State v. Raspberry*, 452 S.W.2d 169, 172–73 (Mo. 1970); *State v. Mobley*, 369 S.W.2d 576, 580–81 (Mo.1963). None of the cases upon which appellant relies, however, involve a death penalty case featuring a bifurcated guilt/punishment hearing.

The focus of the punishment phase of a death penalty case is entirely different from that of the guilt phase. The jury is asked to consider not only the nature and circumstances of the crime but also the character of the defendant. *Gregg v. Georgia*, 428 U.S. 153, 197–98, 96 S.Ct. 2909, 2936–37, 49 L.Ed.2d 859 (1976). Evidence and argument which would not be permitted at the guilt phase—general references to the defendant's prior criminal

record for example—is both highly relevant and permissible at the punishment phase. The rationale of *Raspberry*, that discussion of a defendant's criminal proclivities prejudices a jury which is focusing on the guilt issue, is inapposite when the focus of the inquiry is solely on the punishment which would be imposed.

The death penalty is generally regarded as serving two primary societal purposes: retribution and deterrence of capital crimes by others. *Gregg*, 428 U.S. at 183, 96 S.Ct. at 2929. The Supreme Court, and this Court have each recognized a third purpose: "the incapacitation of dangerous criminals and the consequent prevention of crimes that they may otherwise commit in the future." *Gregg*, 428 U.S. at 183, n. 28, 96 S.Ct. at 2930, n. 28; *State v. Bolder*, 635 S.W.2d 673, 683 (Mo. banc 1982). *See also State v. Trimble*, 638 S.W.2d 726, 737 (Mo. banc 1982) ("[D]eterring those otherwise undeterred").

One of the aggravating circumstances presented to the jury in this case was that appellant committed murder in a place of lawful confinement. Section 565.012.2(9), RSMo Cum.Supp.1983 (now Section 565.032.2(9), RSMo Cum.Supp.1984). The legislative purpose behind this aggravating circumstance concerns, among other things, the deterrence of the individual criminal defendant who, despite lawful confinement, chooses to kill. When this aggravating circumstance is present, a jury may properly consider whether an incarcerated criminal defendant is likely to place the lives of corrections personnel and other prisoners at risk if a sentence other than death is imposed. We find no error in the State's argument.

### B.

Appellant argues that the aggravating circumstance of committing a murder while in a place of lawful confinement should be submitted to a jury only when a murder is committed by a person *sentenced*

---

**15.** The prosecutor argued that appellant had already committed a murder while in lawful confinement, that should the death penalty not be imposed, he would be incarcerated for a minimum of fifty years, that he would have "nothing to lose" and that the jury has a duty to protect "the correctional people whose lives could be in danger."

to prison. Since appellant was not under sentence, but only under arrest, he contends that it was error to submit that aggravating circumstance to the jury.

In *Trimble*, this Court decided that

The legitimate state purpose expressed in the statute is not merely to deter capital murder in prisons where imprisonment may not, but to deter them in every case. It is not a condition precedent to the death penalty for capital murder with the aggravating circumstance that the killing was in a prison that the defendant previously had been given a life sentence.

638 S.W.2d at 737. Nor do we believe it is a condition precedent to imposing the death penalty that the person charge with committing murder while in lawful confinement be under any sentence. The statutory condition precedent is lawful confinement. The policy justifications for this aggravating circumstance, "deterring those otherwise undeterred; protecting prison guards who daily serve the state in a dangerous environment; and protecting other prison inmates who are relatively defenseless in the prison environment.", *Id.*, are equally strong whether the defendant finds himself in lawful confinement as an incident of arrest or as a result of a sentence. The point is denied.

## VIII.

Appellant next argues that the trial court erred in overruling his motion for new trial on the ground that the evidence was insufficient as a matter of law to establish the element of deliberation necessary to a conviction of capital murder.

In reviewing a claim that the evidence is insufficient to support one or more of the elements of a crime, we view the evidence in the light most favorable to the State, accepting as true all evidence and inferences that tend to support the verdict and disregarding all evidence and inferences to the contrary. Our inquiry is limited to whether the evidence, viewed in the light most favorable to the State, is sufficient to support the verdict. *McDonald*, 661 S.W. 2d at 500; *Bolder*, 635 S.W.2d at 679.

 To sustain a conviction for capital murder, the State must prove that the defendant acted with deliberation. Section 565.001, RSMo (repealed effective October 1, 1984).[16] Deliberation is present when the act is performed with a cool and deliberate state of mind. *McDonald*, 661 S.W. 2d at 501; *State v. LaRette*, 648 S.W.2d 96, 102 (Mo. banc 1983). Direct evidence of deliberation is not necessary to support a capital murder conviction; it is sufficient that deliberation is reasonably inferred from the circumstances surrounding the murder. *LaRette*, 648 S.W.2d at 102; *Bolder*, 635 S.W.2d at 680.

 The evidence showed that appellant began his search for George and Winston Jones at the restaurant. When he did not find them, he went immediately to Joy Jones' apartment. Before killing Winston there, appellant announced that he intended to kill the Jones brothers. After killing Winston, appellant went to a drug house at which he expected to find George. When George arrived, appellant forced him at gunpoint into a car, telling him, "I killed your brother and I'm going to kill you." After appellant and George were arrested, appellant managed to step through his handcuffs and attack George, who, as a result of being handcuffed behind his back, was essentially defenseless. Ultimately, appellant killed George in the holding cell by stomping on his head not once, but several times.

The record reveals that appellant had at least four opportunities to abandon his plan to kill George: once after failing to find him at the restaurant; after killing Winston; again after he was arrested by the police; and a fourth time when he was interrupted by officers after battering George into initial semiconsciousness in the holding cell. It is difficult to imagine greater commitment to carrying out a design for death than was displayed by appellant. To argue that there was no deliberation in appellant's acts flies in the face of

**16.** Currently, *see* Section 565.020.1, RSMo Cum. Supp.1984.

reason and ignores the evidence. The point is without merit and is denied.

## IX.

 Finally, appellant argues that the penalty of death in this case is excessive and disproportionate to similar cases, considering the crime and the defendant, and that this Court, in the exercise of independent review, should set aside his sentence. Section 565.014.3(3), RSMo (repealed October 1, 1984) (now Section 565.035.3(3), RSMo Cum.Supp.1984).

The facts of this case show a level of inhumanity and depravity similar to other cases in which the death penalty was imposed upon a finding by the jury that the murder involved "torture or depravity of mind and that, as a result thereof they were outrageously or wantonly vile or horrible or inhuman." *State v. Guinan*, 665 S.W.2d 325 (Mo. banc 1984); *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *State v. Smith*, 649 S.W.2d 417 (Mo. banc 1983), *cert. denied*, 464 U.S. 908, 104 S.Ct 262, 78 L.Ed.2d 246 (1983); *State v. LaRette*, 648 S.W.2d 96 (Mo. banc 1983); *State v. Blair*, 638 S.W.2d 739 (Mo. banc 1982), *cert. denied*, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983); *State v. Newlon*, 627 S.W.2d 606 (Mo. banc 1982), *cert. denied*, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982). Appellant chased George Jones at gunpoint and stated to him that "I just killed your brother, and I'm going to kill you too." Later, appellant with his arms free, assaulted George whose hands were cuffed behind his back. Even after battering George into a semiconscious state, appellant proceeded to jump on his head, inflicting mortal wounds. Appellant's actions were conscienceless and pitiless; they display a depravity of mind sufficient to support the death penalty. On this basis the death penalty given appellant is not disproportionate.

Moreover, appellant was in a place of lawful confinement at the time of the murder for which he is sentenced to death. *See State v. Roberts*, 709 S.W.2d 857 (Mo. banc 1986); *State v. Shaw*, 636 S.W.2d 667 (Mo. banc 1982), *cert. denied*, 459 U.S. 928,

103 S.Ct. 239, 74 L.Ed.2d 188 (1982); *Bolder*, 635 S.W.2d 673; *Trimble*, 638 S.W.2d 726; *Guinan*, 665 S.W.2d at 325. The killing of another while in confinement is a particularly serious offense; we do not hesitate to affirm the death penalty on firm grounds of social policy and as a deterrent to the killer and others in confinement. *See Shaw*, 636 S.W.2d at 677; *Roberts*, 709 S.W.2d at 870.

Upon consideration of the crime, the defendant and other cases in which the death penalty has been given, we hold that the death penalty is neither excessive nor disproportionate in this case.

The judgment of the trial court is affirmed.

BILLINGS, C.J., and DONNELLY, WELLIVER, RENDLEN and HIGGINS, JJ., concur.

BLACKMAR, J., concurs in part and dissents in part in separate opinion filed.

BLACKMAR, Justice, concurring in part and dissenting in part.

I concur in the judgment of affirmance of the conviction and in all parts of the principal opinion except VI and VII.

I specifically approve of the disposition of the *Batson* issue as applied to this pre-*Batson* trial. It is difficult for trial counsel to reconstruct the situation which existed many months ago, when peremptory challenges were made. Now that prosecuting attorneys and judges have been alerted to the *Batson* requirements, it will be easier to analyze particular cases. Judge Robertson quite properly points out that we must place major reliance on trial judges. Prosecutors also have a great responsibility for making sure that the reasons given represent bonafide concerns and not simply window dressing to justify discriminatory strikes.

With regard to Part VI, the principal opinion demonstrates that the question about the defendant's silence at the time he was arrested was not objected to, so that review is under the plain error standard. It is logical to assume that, if the defend-

ant had had a purpose of turning himself in, he would have announced this purpose when arrested. Inasmuch as this evidence was received without objection, the State was entitled to refer to it in argument.

I have serious reservations about the broader propositions as to admissibility of post-arrest silence as set out in Part VI of the principal opinion. The principal opinion is convincing on the facts of the particular case, but I see no occasion for commenting more broadly under these circumstances.

The principal opinion is narrowly drawn in limiting argument about the possibility of the defendant's killing or engaging in violence in the penitentiary, so that it applies only to cases in which killing in custody is assigned as an aggravating circumstance. In spite of this limitation, I believe that the general rule that the defendant's future criminal conduct may not be predicted in oral argument should apply here.[1] The attempted distinction, on the basis that only the penalty phase of the trial is impacted here, is not sufficient. A jury in a one-phase trial would have no occasion to consider the defendant's future conduct unless it found him guilty.

There should be a limit to prosecuting attorneys' attempts to inflame the jury. This Court has been unduly tolerant of prosecutors' arguments in other capital murder cases.[2] Prosecutors have responded with continued inflammatory broadsides. I believe that there is a time for control.

My conclusion is fortified by two other examples in the present case. The prosecutor argued as follows:

Why should you and I, as lawful, working citizens of this community, work the rest of our natural lives just so Calvert Antwine can live in the penitentiary for the rest of his natural life or at least until he's served 50 years in prison?

He continued:

And isn't it much more humane to sentence this man to death so that his broth-

er can get on with his life, and so that the two children can get on with their lives, instead of having to think, every day for the next 50 years, they have a brother or a father locked up in the penitentiary. Ladies and gentlemen, I submit to you that there is only one verdict you can return as to Count II, and that is a verdict of death.

The first of these arguments is obscene to the point of reminding us of the days of Hitler. It has no place in an American courtroom. The argument about relieving the defendant's family of his presence is little better. No objection was made to either of these arguments, and the second was the subject of effective response, but I believe that they may properly be considered in context.

Because of the prosecutor's arguments I am not willing to affirm the death sentence, and would remand the case for retrial of the penalty phase.

1. See State v. Raspberry, 452 S.W.2d 169, 172–73 (Mo.1970); State v. Mobley, 369 S.W.2d 576, 581 (Mo.1963); State v. Tiedt, 357 Mo. 115, 206 S.W.2d 524, 527–29 (1947); State v. Heinrich, 492 S.W.2d 109, 113–16 (Mo.App.1973).

2. See e.g., State v. Driscoll, 711 S.W.2d 512 (Mo. banc 1986); State v. Roberts, 709 S.W.2d 857 (Mo. banc 1986); State v. McDonald, 661 S.W.2d 497 (Mo. banc 1983).