**STATE of Missouri,
Plaintiff–Respondent,**

v.

**Johnnie Hays WILLIAMS,
Defendant–Appellant.**

No. 50993.

Missouri Court of Appeals,
Eastern District,
Division Three.

June 14, 1988.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 27, 1988.

Application to Transfer Denied
Sept. 13, 1988.

Stormy B. White, Asst. Public Defender, Clayton, for defendant-appellant.

William L. Webster, Atty. Gen., Jared Richard Cone, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

KAROHL, Presiding Judge.

This is a direct appeal after a jury trial and conviction on charges of robbery second and burglary first degree. Defendant was charged and tried as a persistent offender. He was sentenced to serve concurrent sentences of twenty years for each charge. These terms were made consecutive to a previously imposed sentence entered in an unrelated case.

The trial occurred prior to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The original issue claimed error in admission of in-court identification testimony because it was based on overly and impermissibly suggestive procedures of the state and unduly suggestive out-of-court identification. The appeal was interrupted by a supplemental claim based upon the holding in *Batson*. We remanded for a hearing. This court now has the benefit of the *Batson* hearing and will consider the original issue and the *Batson* issue.

During the daylight hours of September 27, 1983, Mrs. Cecil Taryle was resting in the second-floor bedroom of her home, when she suddenly saw a black male in the doorway. He went through her purse and other items in the room. After six to eight minutes he placed her in a closet. From that location for another seven to eight minutes she saw him rummaging through other items in the bedroom. He took her husband's ring and coins having a value of approximately $100. She was released from the closet by her husband.

Mrs. Taryle described the robber to the police as a black male, twenty eight to thirty years of age, six feet tall, 185 to 200 lbs., of medium build with a short Afro, wearing glasses, having a neat appearance, articulate, and wearing a tan V–Neck top, brown or blue pants, and a gold chain around his neck.

Mr. Taryle had previously observed a black male wearing clothing that matched the description furnished by his wife. His observation occurred outside of the home for a period of three to five minutes.

On the evening of September 30, 1983, Mr. & Mrs. Taryle attended a live line-up at a police station in the City of St. Louis. The Taryles did not identify defendant, who participated in this line-up with three other black males.

During the first trial, in April 1985, Mrs. Taryle testified and identified defendant. A mistrial was declared when the jury was unable to reach a verdict. During Mrs. Taryle's testimony in the present trial, she again identified defendant. Her testimony was permitted after the court rejected a pretrial motion to suppress the identification and over trial objection that her identification was tainted by overly and impermissibly suggestive procedures, including suggestive out-of-court identification.

On October 1, 1983, George Haftarczyk, an officer of the University City Police Department transported defendant from the holdover in the City of St. Louis to University City. Defendant was wanted in University City on a fugitive warrant and a number of other charges. The officer also conveyed a sealed manila envelope which he believed contained personal property belonging to defendant. At the University City Police Station he inventoried the property including defendant's wallet in which he found a pawn ticket. Ultimately, the pawn ticket was traced to a pawn shop and connected to Mr. Taryle's ring, the ring taken by the robber on January 27, 1983.

An employee of the pawn shop testified. He referred to a "bonded pawn book." When a person pawned personal property at his shop the item was noted and the name, address and social security number of the individual was written on the pawn ticket. The company also photographs the customer with a Regiscope camera. The photo includes a copy of the pawn ticket. This photographic procedure complies with

the requirements of a city ordinance. The witness identified the pawn ticket taken from defendant's wallet as one bearing his handwriting. The pawn ticket noted "a gent's gold wedding band for $15, 1602 Page Industrial Court, 303–569–682." The latter number is a social security number. The witness had no independent recollection of the transaction and was not asked to identify defendant. The photograph of the transaction was not admitted as an exhibit.

During trial Mr. Taryle identified the ring seized by a police officer from the pawn shop as his ring, the ring taken by the robber.

Between the line-up on September 30, 1983 and the original identification of defendant by Mrs. Taryle on April 30, 1985, a number of events occurred pertaining to the identification. Defendant's first claim of error is that these events, together with an unduly suggestive out-of-court identification and the failure of identification at the live line-up, made the in-court identification testimony unreliable. As a result, it is argued, the court erred in failing to sustain a timely objection to the identification testimony.

Between the time of the line-up in September, 1983 and the original trial in April of 1985, the police or the prosecutor told Mrs. Taryle that: (1) Johnnie Williams pawned her husband's ring; (2) Johnnie Williams burglarized Mrs. Taryle's brother and sister-in-law's home; (3) Johnnie Williams was on parole and had been staying at a half-way house; (4) Johnnie Williams had walked into her neighbor's house; (5) the police were fairly certain that Johnnie Williams was the man who had robbed her; (6) Johnnie Williams had been involved in other incidents of "that kind" in her neighborhood; and, (7) when Johnnie Williams was locked up that kind of robbery had stopped in her neighborhood.

█ The determination of the admissibility of pretrial and in-court identification requires a two-step analysis. The court should first consider whether police procedures were impermissibly suggestive. If so, the second step tests the reliability of the subsequent in-court identification. *State v. Robinson,* 641 S.W.2d 423, 427 (Mo. banc 1982); *State v. Howard,* 699 S.W.2d 58, 59 (Mo.App.1985). In regard to the existence of an independent basis of identification, the level of certainty of the witness and the length of time between the crime and the identification are to be considered. *State v. Cole,* 662 S.W.2d 297, 302–03 (Mo.App.1983). However, in order to prevail and suppress identification testimony, defendant bears the burden of proving that the testimony is unreliable. *See, State v. Toney,* 680 S.W.2d 268, 276 (Mo. App.1984).

█ On September 27, 1983, Mrs. Taryle viewed the robber in her home for no less than fifteen minutes. Three days later she did not identify defendant in a line-up conducted under the usual circumstances for that procedure. In April, 1985, while in the courthouse for the original trial on the present charges she claims she identified defendant by selecting him as one of the men in the photograph taken of the line-up. At the time of the photograph identification she was aware of all facts previously related to her by the police or the prosecuting attorney. She denied that when she first made the identification, anyone had told her the defendant was in the photograph. She explained that at that time she was "not quite so frightened" as at the time of the line-up. She did know the defendant's name, but based her identification "on my recollection of his face." She gave this testimony at the hearing on defendant's motion to suppress identification and at trial. On March 20, 1985, one month prior to the first trial and original identification, she was deposed by defendant and testified that at the time of the line-up she "wasn't upset emotionally, but I just felt that I was being very careful not to identify the wrong man, and I was terribly concerned about my husband during that ... well, I don't know. This is two different points." She acknowledged that she was not rushed at the time of the line-up and had every opportunity to make an identification. The apparent discrepancy relating to her inabili-

ty to identify at the live line-up but subsequent ability to identify defendant solely from the line-up photo and her memory requires a careful analysis of the evidence relating to the original out-of-court identification. The trial court was offered the testimony of Mrs. Taryle, the Assistant Prosecuting Attorney and an investigator for the Prosecuting Attorney regarding the original out-of-court identification.

All agree that the identification occurred when Mrs. Taryle was at the courthouse for the purpose of testifying in the first trial. Mrs. Taryle acknowledged that she had received additional facts from the police or the prosecuting attorney regarding Johnnie Williams. She denied that anybody identified the defendant for her or showed her any kind of photograph of defendant other than the photograph of the line-up. The photograph was presented to her at the courthouse together with a question from the prosecuting attorney, "Does this look like a line-up that you saw that Friday night?" She then identified defendant. She denied being told by anybody who the defendant was in the photograph. Particularly, she was asked, "[w]as that identification based on anything that you might have heard or anything that you might have seen or anything that anybody told you regarding the defendant?" Her answer was, "No ... [what was it based on?] on my recollection of his face."

The Prosecuting Attorney testified in connection with the motion to suppress the identification and defendant's offer of proof on this issue. She was asked by defendant's counsel to describe the conditions under which she showed Mrs. Taryle the photograph. She testified she showed Mrs. Taryle the photograph in a small room outside the courtroom. She did not know where Johnnie Williams was at that time. She did not recall her exact words but "the gist of the conversation was, 'when you go in to testify, that I will, I'm going to show you a photograph, and I'm going to ask you what it is, and I'm going to ask you if it fairly and accurately depicts what it is,'

and so I asked her—and I don't know the sequence—but I asked her to—showed her the photograph and asked her, could she tell me what that was." After Mrs. Taryle identified Johnnie Williams the prosecuting attorney immediately informed defense counsel and the judge of what had happened.

James Murphy, an investigator for the Prosecuting Attorney, remembered the circumstances differently. On April 30, 1985, he was with Mrs. Taryle who was in a wheelchair. He remembered being with her at the door of the courtroom but did not know at what stage of the trial this occurred. He observed Mrs. Taryle look into the courtroom. On doing so, Mrs. Taryle "said that this was the man. I don't remember the words, 'that's him' or something on that order. I don't know that we were standing outside the courtroom at that time, though. For sure. I don't know where we were exactly. It was right within the general time frame, though." Mr. Murphy then took Mrs. Taryle back into chambers, located the prosecuting attorney and reported to her what had just transpired. If the trial court believed this testimony, then the additional facts reported to Mrs. Taryle, combined with her seeing Johnnie Williams in the courtroom would have irrevocably tainted the identification. This is particularly true where the witness had ample opportunity to view the robber, was unable to make an identification at the line-up just three days later, but after being supplied with additional facts, was able to make an identification nineteen months later, during the first trial.

However, there was testimony from Mrs. Taryle from which the trial court could find that the information which the police or the prosecuting attorney communicated to Mrs. Taryle did not influence the eyewitness identification. The trial court was free to ignore the testimony of investigator Murphy which directly opposed the testimony of Mrs. Taryle.[1] It is possible that the events described by the prosecuting attor-

---

1. We do not address the duty, if any, of the prosecutor in relation to the testimony of her own investigator.

ney in her testimony occurred after the event described by Investigator Murphy. Significantly, the testimony of the Assistant Prosecuting Attorney supports the testimony of Mrs. Taryle but does not refute the testimony of Investigator Murphy. Credibility was an issue for the trial court and it apparently accepted Mrs. Taryle's explanation.

We are constrained to comment that the information furnished to the complaining witness by the police after the line-up and before the original trial created the problem for the trial court and this court. To that extent, at least, it was blameworthy. Such conduct creates the possibility of denying the state and the defendant a fair trial. Except for the second and independent proof of guilt, Mr. Taryle's ring and the pawn ticket for the ring found in defendant's possession, the conviction would remain suspect because of such conduct.

In summary, Mrs. Taryle's testimony supports a finding that her identification of defendant's face was based upon her own observation and visual recollection independent of any suggestive procedures. We find no error in admitting the testimony. *State v. Overstreet,* 694 S.W.2d 491, 495 (Mo.App.1985). The defendant has not established the necessary connection between the information Mrs. Taryle received and the subsequent identification of appellant's photograph. *State v. Toney,* 680 S.W.2d 268, 276 (Mo.App.1984). Point denied.

■ Defendant's remaining point requests a new trial on the basis of the opinion of the United States Supreme Court in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). During the trial, which occurred before *Batson,* the state used peremptory challenges against all black venire persons on the panel. This insured that defendant, a black male, would be tried by an all white jury. Defendant now claims the court erred at the *Batson* hearing when it failed to find that the state's strategy was racially motivated and violated defendant's rights to a fair and impartial trial, to due process and equal protection guaranteed by Article I, Sections 10 and 18(a) of the Missouri Constitution and the United States Constitution, Amendments V, VI and XIV. It was stipulated that the prosecuting attorney struck all blacks on the jury panel and defendant entered a timely objection and requested a mistrial on that account. We considered only that issue and ordered a *Batson* hearing. The record on the present appeal includes the voir dire process and the requested hearing which was conducted on December 4, 1987, two years and three months after the trial. On December 22, 1987, the court entered its decision that the state's use of peremptory challenges was not racially motivated. This was one week after the Missouri Supreme Court decided *State v. Antwine,* 743 S.W.2d 51 (Mo. banc 1987).

We first dispose of defendant's motion for an additional remand to the trial court for further findings of fact and conclusions of law. The first premise of the motion is that the trial court failed to follow our previous mandate to determine whether defendant made a prima facie showing of a discriminatory practice. Although no express finding appears, we note that the state assumed the burden of rebutting a prima facie case, and the court addressed the merits in its findings of fact, conclusions of law and in its report to this court. We assume an implied finding that a prima facie case was made by defendant upon showing that defendant is black and that the state struck all three black venirepersons on the panel. No remand is necessary. The second premise of the motion is that the findings and conclusions of the court are unsupported by the record. The parties have briefed and argued these issues which we will address on the merits. Motion for further remand is denied.

Defendant contends the remand hearing was flawed because the court rejected evidence which showed discriminatory jury selection by the state in the first trial where a mistrial resulted. The court found such evidence irrelevant. Since we find that no discriminatory practice occurred in the present trial we find no prejudicial error in the ruling. We do not decide that the court

would err if, in its discretion, it admitted such evidence.

Defendant directly attacks the finding of fact of the trial court that "the exercise of peremptory strikes by the State of Missouri in this cause was not racially motivated." "The ultimate burden of persuasion lies with and never shifts from defendant." *State v. Antwine*, 743 S.W.2d at 63. We consider a finding of fact. *Id.* at 66. We are instructed that findings of fact shall not be set aside unless clearly erroneous. *Id.* It is in this light that we review the voir dire and *Batson* hearing transcript relative to removal by the state of black venirepersons resulting in an all white jury selected to try charges against a black man where the principle eyewitness was an elderly white woman.

At the *Batson* hearing the parties stipulated defendant was black, and an all white jury resulted when the state struck three black women from the panel. The evidence was the testimony of the trial assistant prosecuting attorney (prosecutor). The state used its challenges to strike venirepersons Robbeye Covington, Rosetta Johnson and Thelma Davis. The prosecutor prepared for the hearing by referring to trial notes and the transcript prepared for this appeal. She also testified that she had some independent recollection of the trial.

The prosecutor recognized that she exercised peremptory challenges for three black female venirepersons, Covington, Johnson and Davis. The relevant testimony follows:

I struck Ms. Covington principally because she had indicated she had been a witness for the defense in a case.

\* \* \* \* \* \*

Ms. Johnson had indicated that she had a brother-in-law who had been convicted of robbery and I believe was serving time in Jefferson City.

I also see a note that regarding possibly a cousin who also might have been in the penitentiary or who had been involved with the law.

\* \* \* \* \* \*

Ms. Davis had indicated that her son, I believe, had been fired as a county police officer, although I'm not certain what—certainly not familiar with him or anything about it. But, I believe there was that indication.

She had indicated that her son had been treated unfairly by the police. She had indicated that she had four nephews who were serving time. And, I felt that she would not be appropriate for the jury.

The prosecutor found an indication in her notes that venireperson Debra Miller, a white woman, married after her husband's brother was convicted on a robbery charge. Her brother-in-law was still in prison, but she had no contact with him. Further, she was divorced at the time of trial. Miller also indicated a previous relationship with another brother-in-law who had been in the penitentiary, but she had no current relationship with him. In addition, venireperson Claire Simon, a white woman, had a nephew serving a fifty year sentence for murder. She was not stricken because of her comment that her nephew "got what he deserved." Further, Simon was acquainted with the elected Prosecuting Attorney of St. Louis County. The defense struck Simon.

The trial court made findings of fact. It relied on the original transcript and the testimony at the *Batson* hearing and concluded "... the exercise of peremptory strikes by the State of Missouri in this cause were [was] not racially motivated. They were maintained for racially neutral and appropriate grounds."

The court found that Covington had been a witness for the defense in a City of St. Louis case concerning teenagers fighting in school. Ms. Covington was the only venireperson who had previously testified for the defense. However, there was no indication in the record regarding the specific nature of the case in which the testimony was given.

The court also found that five venirepersons were related to individuals who had been convicted of crimes. Of these, only the two blacks, Rosetta Johnson and Thel-

ma Davis, were stricken by the state. The state did not strike Claire Simon, Debra Miller or Cindy Miller, all of whom were white. The court accepted the prosecutor's explanations for the apparent difference in treatment. Simon's nephew was serving fifty years for murder, but she volunteered that "he got what he deserved." In addition, she had a social relationship with the elected prosecuting attorney. Debra Miller had a brother-in-law working as a police officer with the St. Louis Metropolitan Police. A second brother-in-law was in the penitentiary for the crime of armed robbery. However, she had no contact with the prisoner, and the conviction occurred before her marriage. In addition, she had been present at her place of employment when five armed robberies occurred. Cindy Miller was the former sister-in-law of Debra Miller. Her ex-husband was serving the sentence for armed robbery. However, she was juror Number 36 and not among the available venire from which jurors were selected.

After a review of the findings and the supporting testimony available in the trial transcript and in the *Batson* hearing we conclude that the findings of fact were not clearly erroneous. *State v. Antwine*, 743 S.W.2d at 66. The findings are not only "plausible in the light of the record viewed in its entirety," *Id.* at 66, they are fully supported by the record. The evidence and the findings apply specifically to the particular facts of the case being tried. They are substantial and not pretextual. Where similar answers were given by white and black venirepersons, further evidence existed which justified the distinctions that the prosecutor drew in support of her selections. Point denied.

We affirm.

KELLY, J., concurs.

SMITH, J., concurs in result.