**STATE of Missouri, Plaintiff–Respondent,**

v.

**Anthony ANDREWS, Defendant–Appellant.**

**No. 54589.**

Missouri Court of Appeals, Eastern District, Division Five.

April 11, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 9, 1989.

Application to Transfer Denied June 13, 1989.

Harvey I. Feldman, St. Louis, Stormy White, Asst. Public Defender, Clayton, for defendant-appellant.

William L. Webster, Atty. Gen., John P. Pollard, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SIMEONE, Senior Judge.

Defendant-appellant, Anthony Andrews, was charged, tried by a jury, and found guilty of four counts of robbery in the first degree, two counts of attempted robbery in the first degree and six counts of armed criminal action for twice robbing the Farm and Home Savings and Loan located at 9601 Halls Ferry in St. Louis County. Sections 569.020, 564.011, 571.015, R.S.Mo.

1986. He was sentenced by the court to a total of 53 years. He appeals. We affirm.

## I.

Immediately prior to the trial, which took place in January, 1988, an evidentiary hearing was held on three pre-trial motions filed by appellant: (a) to suppress evidence, a cap or hat, allegedly worn by the appellant during one of the robberies, (b) to suppress statements and (c) to suppress identification of a photo and live lineup. After the hearing on the motions, the court eventually overruled each of them.

Also prior to trial evidence, a venire of some thirty jurors were interrogated. On the venire were four black jurors. At the end of voir dire, the prosecution used two of his peremptory challenges to strike two of the four black jurors—Number 25, Vonnie M. Raglin, and Number 31 (who later became No. 21) Nancy A. Russell. Two other black jurors were not stricken. Defense counsel challenged the validity of the jury on the grounds that these venirepersons were stricken because of their race and the State gave no rational, neutral or lucid reason why they were not qualified to serve. The court requested the prosecution to give an indication of "why you struck the two that you did." The prosecutor replied that he struck No. 25 because:

[i]f I recall she is a maid and seemed to be of a lower income level that I suspect Defendant's alibi witnesses will also be either unemployed or have as far as employment an extremely low income level and because of the possible identification of characters like that....

As to juror Number 31, the prosecutor stated that he struck her because:

That one is easy, your Honor. If I recall, I asked what she did for a living. She retired. She indicated she hadn't worked ten or fifteen years, couldn't really remember the last time she worked was. If I recall, her mentality didn't seem to be very sharp and ... secondly, the Defendant ... has been unemployed

for years. I suspect the alibi witnesses he intends to call have been unemployed for years and for both of those reasons I struck Nancy Russell.

Defense counsel stated that these reasons do not show neutral and lucid reasons and moved that the jury panel be quashed. The court commented that:

Well, since in my opinion he only struck two, there were four originally on the panel, he struck two, I am not even sure that he would have had to give any reasons for those two, but he has and I am satisfied so I will overrule your Motion ... to strike the jury.

## II.

The trial then began on January 26, 1988. The jury could reasonably find the following.

Farm and Home Savings and Loan is located at 9601 Halls Ferry in Jennings, St. Louis County. On two occasions [1] the Savings and Loan was robbed—once on Friday, November 7, 1986 and again on Monday, February 2, 1987. Employed at the Savings and Loan at the time of these events were Shelley Upple, a teller, Marilyn Brown, a customer service representative, Sallie Gooch, a marketing service representative, Rosemary Ivie, the head teller, and Carol Crump, the savings manager.

At about 5:00 p.m. on the evening of November 7, 1986, Ms. Brown was seated at her desk and saw the robber enter the bank and proceed to another employee's desk. He soon left the bank but shortly returned. When he returned he went to the teller window of Shelley Upple. He tapped her on the back, she turned around and the robber said "Give me all your money." He was about two feet away from her. The man had a "small black gun with a brown handle." The gun was "probably a half a foot away" from her. Shelley gave the man approximately $3,000. The man had on a stocking cap and a green jacket. Rosemary Ivie was nearby. She

---

[1]. Appellant was originally charged with robbery of the Savings and Loan in June, 1986, but these charges were *nolle prossed.*

was running vault tickets and she noticed Shelley was being robbed. She heard the man ask for money. The man then pointed the gun at Rosemary and said "I'll take your money too." But she had none and with that he went to the window of Sallie Gooch, and demanded money too. Sallie "took her money out of the drawer and handed it to him." She gave him approximately $2,000. The man was observed by the women for several minutes ranging from three to eight. The man left the Savings and Loan.

Then about noon on February 2, 1987, Ms. Brown was again working at her desk and saw the same man enter the savings and loan. The "minute he walked through the front doors" she recognized him because "he was the same guy that had came [sic] in in November." Again he walked over to the teller line and went to Shelly's window, but at that time Carol Crump was "working her window." Carol Crump recognized him. He had a gun. She gave him money. He then went to Sallie Gooch's window and asked for her money. Sallie testified that the same man came into the bank in November and that she recognized him from "the previous robbery." She also gave him money. He then went to Rosemary Ivie, held a gun on her, and asked if she had any money and although she had some, she didn't give it to him. The man had on a green jacket, jeans and a dark covering on his head, a black nylon stocking cap. The man left.

Police Detective, Herman Barnes, Jr. of the City of Jennings police was directly involved in the investigation of the robberies. The FBI was also involved. The women witnesses were shown many photographs by the FBI and then shown five photographs of suspects by Detective Barnes. Barnes testified that his investigation of the initial robbery focused on several possible suspects. At some point, the investigation ultimately came to focus on the appellant. That came about because a "very reliable confidential informant that has worked with me approximately six to eight years gave me a telephone call and advised me of a name that I should consider as a possible suspect." Barnes went to

the Savings and Loan and showed the women five photographs of suspects independently. Each of the women picked out the defendant. Later a live lineup was held at the Jennings police station and each of the women independently picked out the defendant as the man who robbed the savings and loan company on both occasions. Furthermore, at the trial each of the women witnesses, Shelley Upple, Marilyn Brown, Carol Crump, Rosemary Ivie and Sallie Gooch, identified the defendant as the man who committed both robberies on November 7 and February 2.

During the trial, an investigator of crime scenes testified. On February 2, he was requested by the FBI to respond to retrieve physical evidence they had located in the rear yard of a residence about a block away from the savings and loan. The investigator went there and retrieved a black nylon stocking cap. Hairs were found inside the cap. Some hairs were taken from the appellant's head and the two samples were compared by the St. Louis County Crime Laboratory. The supervisor of the laboratory testified that the "results of the comparison of hairs removed from the black nylon stocking cap and the known hair samples submitted as those of Anthony Andrews disclosed the presence of similarly appearing hairs and that was similarly appearing in a microscopic sense." The statistical relevance of the comparison is such that "if you have two hairs appearing alike microscopically, the statistics say those hairs not to be the same individual are one in 850 individuals."

In the defendant's case, the appellant denied taking part in either of the robberies. The thrust of his defense was misidentification and alibi. While he could not recall how he spent the day on November 7, he testified that on February 2, 1987, he was at his stepmother's for a "get together" for his girlfriend. The "get together" lasted over the weekend and into Monday. He testified he was there all day, February 2. His stepmother, sister and girlfriend corroborated his testimony.

The court gave some 30 instructions, the cause was argued and after about six and

a-half hours, the jury returned its verdict of guilty of all twelve counts. In due time defendant appealed.

### III.

In his first point, appellant contends that the trial court erred (1) in overruling his motion [2] to disclose the identity of the confidential informant because the information was vital to his defense and (2) in permitting the state to introduce evidence that information from a confidential informant led to his arrest because such evidence led the jury to believe facts which showed appellant was guilty and caused the jury to convict on matters not in evidence. He relies upon principally on *State v. Wandix*, 590 S.W.2d 82 (Mo. banc 1979) and *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) and *State v. Nafziger*, 534 S.W.2d 480 (Mo.App.1975).

He argues that the appellant's photograph was shown to various witnesses in the Farm and Home Savings and Loan robberies because of information from a confidential informant and the court permitted the state to conceal the name and identity of the informant. He also argues that in the testimony of Detective Barnes, Barnes stated that his investigator's investigation focused on several possible suspects and ultimately focused on the appellant. That came about "from a very reliable confidential informant that has worked with me approximately six to eight years ..."

The issue to be resolved therefore is whether the trial court erred in overruling appellant's motion to disclose the confidential informant.

Whether the identity of a confidential informant must be disclosed is not easily resolved. What is referred to as the informer's privilege is in reality the privilege of the State to withhold the identity of persons who furnish information to officers charged with the enforcement of the law. The modern principles relating to disclosure of an informant are expressed in *Roviaro v. United States, supra.* The general principle is that there is a privilege to withhold the identity of the informant. The purpose of the privilege is the "furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law enforcement officials, and, by preserving their anonymity, encourages them to perform that obligation." *Roviaro, supra,* 77 S.Ct. at 627. Once the policy is made of full disclosure, the effectiveness of the informer is destroyed.

But this privilege is limited. The limitations arise from the fundamental requirements of fairness. "Where the disclosure of an informer's identity ... is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro, supra,* 77 S.Ct. at 628. Hence, the Supreme Court in *Roviaro* stated:

> We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Roviaro, supra,* 77 S.Ct. at 628.

The *Roviaro* concept was adopted in Missouri in *State v. Edwards*, 317 S.W.2d 441 (Mo. banc 1958) and *State v. Yates*, 442 S.W.2d 21 (Mo.1969) and *State v. Nafziger, supra,* 534 S.W.2d 480. *See also,* Annot., 76 A.L.R.2d 275 (1961) and 1 L.Ed.2d 1999 (1957).

In *Roviaro*, the court posited three possible defenses for which the informant's testimony could be vital: entrapment, mistak-

---

**2.** Prior to evidence being introduced, counsel for defendant made an oral motion that the prosecution be required to name and identify the informant because the informant is the sole individual who places defendant in a position of suspicion and has caused him to be a suspect and ultimately prosecuted. The court overruled the motion.

en identity of the person and lack of knowledge of contents of a package.

The decision whether the informant is essential to a fair determination of the issue in any given case or circumstance is for the trial court in the first instance, and whether the defendant may have a fair trial without requiring disclosure is a matter resting in the sound discretion of the trial court. *State v. Yates, supra,* 442 S.W.2d at 25; *State v. Taylor,* 508 S.W.2d 506, 512 (Mo.App.1974). In reviewing the trial court's decision, the appellate court must weigh the cruciality and relevance of disclosure to the defense against the State's need for nondisclosure. *State v. Sweeney,* 701 S.W.2d 420, 426 (Mo. banc 1985).

In *State v. Wandix, supra,* a confidential informant accompanied officers at a purchase of certain drugs. Identity of Wandix was a crucial issue in the case. It was undisputed that the person who sold the drugs was the person introduced to the undercover officer by the informant. The informant observed the officer and the seller enter the house where the sale took place. The informant was in a position to offer highly relevant and material testimony as to identity. Furthermore, the informant was no longer active. The Supreme Court concluded that the informant was essential to a fair determination on the issues and laid down the following principles:

> In summary, the rule requires disclosure where the informant was in a position to offer testimony relevant and crucial to the defense; *i.e.* disclosure would not be required if the testimony were on minor or collateral issues or if the testimony would be merely cumulative of that of other neutral parties. The degree of cruciality necessary to require disclosure must be balanced against the State's need for non-disclosure; *i.e.* possible non-disclosure where the informant is still active in other investigations and the accused's need is minimal.

*Wandix, supra,* 590 S.W.2d at 85. *Cf., State v. Sweeney, supra,* 701 S.W.2d at 426.

Similarly in *State v. Nafziger, supra,* where the informant was a critical witness whose testimony as to identity was highly probative given the contradictory testimony of a police officer and the defendant, and where there was no other witness to support the defense of mistaken identity, it was held that disclosure should be made.

In *State v. Payne,* 660 S.W.2d 24 (Mo. App.1983), this court recognized the general principles above relating to the disclosure or nondisclosure of an informant, and that the trial court's determination that a defendant can receive a fair trial without disclosure is a matter of discretion. This court held that in cases involving a "tipster" type of information, who merely conveys information to the officers of government but neither witnesses nor participates in the offense, the courts generally hold that disclosure is not material and therefore not required. *Payne, supra,* 660 S.W. 2d at 26; *quoting, United States v. Barnes,* 486 F.2d 776, 778, n. 3 (8th Cir. 1973).

In the case at bar, the confidential informant merely conveyed appellant's name to the police. There is no evidence that he was a witness or a participant. The three eyewitnesses to both robberies independently picked appellant out of both a photo and a live lineup. Here, the identity of the informant was not crucial to the defense. The informant had worked with Officer Barnes for a number of years and had been reliable. He was still active.

Appellant also contends in his first point that the court erred in permitting the state to introduce evidence that information from the informant led to his arrest. This, he says, led the jury to believe that there were facts not before the jury that he was guilty and caused the jury to convict. This he asserts as plain error. Rule 30.20. In order to invoke the plain error rule, there must be a sound, substantial showing of manifest injustice or that a miscarriage of justice has resulted. *State v. Williams,* 637 S.W.2d 839, 841 (Mo.App.1982); *State v. Vidauri,* 699 S.W.2d 46, 48 (Mo.App. 1985). We do not find such plain error. There is no showing that appellant was

convicted because the jury was informed that a confidential informant existed. The jury could reasonably find appellant guilty because of the state's case against him.

Under all the circumstances, we cannot conclude that the trial court abused its discretion in refusing to sustain the motion to disclose the confidential informant or in permitting the state to introduce evidence that information from the informant led to appellant's arrest.

## IV.

In his second point, appellant contends that the trial court erred in denying his motion to strike the jury panel after the state used two of its peremptory challenges to remove two persons of the same race from the panel. He contends that the state's strikes were racially motivated and the reasons given for removal were purely pretextual, thus denying him of his rights to due process and equal protection and to a fair and impartial jury under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and *State v. Antwine*, 743 S.W.2d 51 (Mo. banc 1987).

In *Batson*, a black defendant was tried and convicted by an all white jury after the prosecutor used peremptory challenges to strike the only four blacks in the venire. The United States Supreme Court reversed the conviction and found the discriminatory use of peremptory challenges violated the Fourteenth Amendment. The court held that:

> The Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the state's case against a black defendant. 106 S.Ct. at 1719.

In *Batson*, the Supreme Court also ruled:

[t]hat a defendant in a state criminal trial could establish a prima facie case of racial discrimination violative of the Fourteenth Amendment based on the prosecution's use of peremptory challenges to strike members of the defendant's race from the jury venire, and that, once the defendant had made the prima facie showing, the burden shifted to the prosecution to come forward with a neutral explanation for these challenges.

*Griffith v. Kentucky*, 479 U.S. 314, 316, 107 S.Ct. 708, 710, 93 L.Ed.2d 649 (1987).

In interpreting *Batson*, our Supreme Court has held that the defendant may establish a prima facie case of discrimination by showing that (1) defendant is a member of a cognizable racial group, (2) that the prosecutor has exercised peremptory challenges to remove members of the defendant's race from the venire, and (3) that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. Relevant circumstances include a pattern of strikes against black jurors included in the panel as well as the prosecutor's questions and statements during voir dire. *Batson, supra*, 106 S.Ct. at 1723. The establishment of a prima facie case creates a rebuttable presumption that the prosecutor exercised his peremptory challenges in a discriminatory manner. The burden then shifts to the State to rebut the presumption with a neutral explanation for challenging black jurors.[3] The neutral explanation must give a clear and reasonably specific explanation of the State's legitimate reason for exercising the challenges. If the State comes forth with a neutral explanation the presumption is rebutted and defendant then has the obligation to demonstrate that the State's ex-

---

3. For general discussions of *Batson* and neutral explanations, *see* Annot., 90 L.Ed.2d 1078; Annot., 79 A.L.R.3d 14 and Supp. and 28 Mo.Digest, Jury, key no. 120 *et seq.* and Supp.; Note, *Batson v. Kentucky*, 31 St. Louis U.L.J. 473 (1987).

The following cases held there was a neutral explanation: *State v. Taylor*, 747 S.W.2d 150 (Mo.App.1988)—jurors might identify with defendant—educational background; *State v. Crump*, 747 S.W.2d 193 (Mo.App.1988)—black

defendant could not complain when tried by jury 42% black; *State v. Jones*, 747 S.W.2d 229 (Mo.App.1988)—striking younger persons because older, more mature persons would be more sympathetic to victim; *State v. Jackson*, 763 S.W.2d 349 (Mo.App.1988)—lack of responsiveness, negative demeanor and friendship with a felon; *State v. Elem*, 747 S.W.2d 772 (Mo.App.1988). *See also*, listing of federal cases of neutral explanation in *State v. Tolliver*, 750 S.W.2d 624 (Mo.App.1988).

planations are merely pretextual and not the true reason for the peremptory challenge. The third element requires the trial court to consider the State's explanation of the manner in which it employed its challenges prior to making a final determination as to whether a prima facie case exists.[4] *Antwine, supra*, directs the trial judges to consider the prosecutor's explanations as part of the process of determining whether a defendant has established a prima facie case of racially discriminatory use of peremptory challenges. *Antwine*, 743 S.W.2d at 63–64; *State v. Blackmon*, 744 S.W.2d 482, 483–484 (Mo.App.1988). *Antwine* also held that *Batson* leaves room for the State to exercise its challenges on the basis of the prosecutor's legitimate hunches and past experience so long as racial discrimination is not the motive. The trial judge is required to assess the entire milieu of the voir dire objectively and subjectively. *Cf., State v. Butler*, 731 S.W.2d 265 (Mo.App.1987). The trial judge must focus all of the information and intuitive perceptions he has gathered to determine whether the prosecutor's use of his peremptory challenges proceeds from a racially discriminatory motive. In *Antwine*, our Supreme Court stated:

> A judgment as to the validity of the State's 'neutral explanation' presents the trial judge with a particularly troubling task. Jury selection is, after all, an art and not a science. By their very nature, peremptory challenges require subjective evaluations of veniremen by counsel. Counsel must rely upon demeanor, gender, ethnic background, *employment*, marital status, age, *economic status*, social position, religion and many other fundamental background facts.... (Emphasis added).

*Antwine, supra*, 743 S.W.2d at 64. Great responsibility is placed in the trial judge to decide if the circumstances concerning the use of peremptory challenges creates a prima facie case of discrimination against black jurors.

The *Antwine* court also furnished guidance to the appellate courts. The court held that a finding of discrimination or not is a finding of fact; great deference is to be given the trial court; and findings of fact are not to be set aside unless clearly erroneous and due regard shall be given to the trial court to judge the credibility of the witnesses. A finding is clearly erroneous, if the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Antwine, supra*, 743 S.W.2d at 66.

In the case at bar, after the voir dire, counsel for defendant challenged the validity of the jury because there was no rational or neutral basis for striking two of four black jurors. When asked why the prosecutor struck No. 25 juror, the prosecutor replied that the venireperson was of lower income or unemployed and that she would identify with alibi witnesses.

As to juror Number 31, who became No. 21, Nancy Russell, the prosecutor stated that he struck her because she was retired and unemployed and her mentality didn't seem very sharp.

Defense counsel replied that the reasons given do not show a neutral, rational and lucid reason and moved that the jury panel be quashed.

The court declared that in its opinion that the prosecutor may not have had to give any reasons but in any event he did give a neutral explanation.

■ Under the facts here, we are not convinced that a prima facie case of discriminatory peremptory challenges was made. But in any event the prosecutor did provide a neutral explanation for striking two of the four black venirepersons. While the prosecutor may not merely state that he challenged the juror on his intuitive judgment nor merely deny he had a discriminatory motive, the prosecutor here gave a neutral explanation related to the case—clearly and reasonably specific. Here, the trial court found that defendant did not make a prima facie case showing that the prosecutor used his strikes in a discriminatory fashion, but further found

4. *See* the excellent analysis of the procedural steps outlined by this court in *State v. Price*, 763 S.W.2d 286 (Mo.App.1988).

that the prosecutor gave a reasonable neutral explanation. There was no disproportionate use of strikes against blacks.

In *State v. Jones, supra,* certain jurors were struck because they were young and possessed less life and work experience than older and more mature jurors, and thus would tend to be more sympathetic to the victim. *See also, State v. Jackson, supra,* 763 S.W.2d 349.

The experienced trial judge viewed the panel members, listened to their numerous responses and considered the prosecutor's explanations of unemployment and a low income level who might identify with witnesses or the venireperson's mentality. *See State v. Taylor, supra,* 747 S.W.2d at 152. There was no showing by defense counsel that whites were treated differently. Upon review of the voir dire transcript we can find no statements, questions or other circumstances to support an inference of discrimination. Unemployment and economic status or intelligence are sufficient neutral explanations.

■ Furthermore, in this case, the prosecutor did not strike all four black venirepersons. Two were not struck and left on the jury. Two were stricken. The language and spirit of *Batson* as well as notions of fundamental fairness lead to the conclusion that the defendant has no case of discriminatory practice or is denied equal protection when he is tried by a jury with substantial black representation as long as the motive is not to strike a venireperson because of race. *State v. Crump,* 747 S.W.2d 193, 195–96 (Mo.App.1988). It has also been held that where jurors might identify with defendant or his family, there is no automatic reversal or violation of equal protection although failure to strike white jurors are similarly situated—rather it is a factor.

Appellant relies on *State v. Reliford,* 753 S.W.2d 9 (Mo.App.1988) to support his contention that the jury panel should be stricken. *Reliford* is not dispositive. In *Reliford,* the prosecutor failed to demonstrate neutral explanations for using his peremptory challenges. The prosecutor struck a black man because the juror stated that he knew the defendant from church and the juror might feel uncomfortable in rendering a verdict against the defendant. At the same time the prosecutor did not strike a white man similarly situated. *Reliford* is distinguishable and is not dispositive.

Upon the whole record on this issue, the trial judge viewed the panel members and listened to their responses to questions. The court considered the explanation of the prosecutor, it noted that two black jurors were left on the panel and found as a fact no discriminatory exclusion. We do not find the court's finding of no discrimination clearly erroneous.

### V.

Having considered the points raised by the appellant, and finding no prejudicial or reversible error, the judgment of conviction is affirmed.

Judgment affirmed.

PUDLOWSKI, C.J., and CARL R. GAERTNER, J., concur.